1 | **WINFIELD S. PAYNE, III, ESQ., SBN 90142**
WINFIELD S. PAYNE & ASSOC.
2 | 4308 Lime St.
Riverside, Ca. 92501
3 | (951) 276-9300 (Voice)
(951) 276-9301 (Fax)
4 |

5 | **WILLIAM L. CONTI, ESQ., SBN 113759**
330 Rancheros Dr., Suite 212
6 | San Marcos. Ca. 92069-2978
(760) 891-0801 (Voice)
7 | (760) 891-0803 (Fax)

8 |

9 | Attorneys for Debtor VARNER BUSINESS PARK, LLC

10 |

11 | **UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

12 |

13 | In re:

14 | VARNER BUSINESS PARK. LLC.

15 |    Debtor.

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

BK. No. 6:09-bk-25784-BB

**DEBTOR'S ORIGINAL DISCLOSURE STATEMENT DESCRIBING DEBTOR'S ORIGINAL CHAPTER 11 PLAN**

**Disclosure Statement Hearing**

DATE:
TIME:
CTRM:

**Plan Confirmation Hearing**
**[See Disclosure Statement for Voting and Objecting Procedures]**

DATE:
TIME:
CTRM:

# TABLE OF CONTENTS

**I. INTRODUCTION**

**A.  Purpose of This Document** ........................................................................ 1

**B.  Deadlines for Voting and Objecting: Date of Plan Confirmation Hearing** ............. 2
  1. Time and Place of the Confirmation Hearing ........................................... 3
  2. Deadline For Voting For or Against the Plan ........................................... 3
  3 . Deadline For Objecting to the Confirmation of the Plan ............................ 3
  4. Identity of Person to Contact for More Information Regarding the Plan ........ 3

**C.  Disclaimer** ........................................................................................... 3

**II. BACKGROUND** ....................................................................................... 4

**A.  Description and History of the Debtor's Business** ........................................ 4

**B.  Principals/Affiliates of Debtor's Business** ................................................. 6

**C.  Management of the Debtor Before and After the Bankruptcy Filing** ................. 6

**D. Events Leading to Chapter 11 Filing** ......................................................... 6

**E. Significant Events During the Bankruptcy** .................................................. 7
  1. Bankruptcy Proceeding ........................................................................ 7
  2. Other Legal Proceedings ...................................................................... 8
  3. Actual and Projected Recovery of Preferential
    or Fraudulent Transfers ...................................................................... 9
  4. Procedures Implemented to Resolve Financial Problems ............................ 9
  5. Current Financial Condition of the Debtor ............................................. 9

**III. SUMMARY OF THE PLAN OF REORGANIZATION** .................................... 9

**A.  What Creditors and Interest Holders Will Receive Under the Proposed Plan** ......... 9

**B. Unclassified Claims** ............................................................................... 9

  1. Administrative Expenses ..................................................................... 10
  2. Priority Tax Claims ........................................................................... 11

**C.  Classified Claims and Interests** ................................................................ 11

  1. Classes of Secured Claims .................................................................. 11
  2. Classes of Priority Unsecured Claims .................................................... 16

i.

4. Classes of General Unsecured Claims .................................................. 16
5. Class of Interest Holders .............................................................. 17

**D. Means of Performing the Plan** ..................................................... 17

1. Funding for the Plan ................................................................... 17
2. Post-Confirmation Management ..................................................... 18
3. Disbursing Agent ...................................................................... 18
4. Payment of Professionals' Fees and Expenses After Confirmation Date ......... 18
5. Compromises of Claims or Controversies ........................................... 18
6. Disputed Claims ....................................................................... 18
7. Objections to Disputed Claims....................................................... 19
8. Unclaimed Distributions.............................................................. 19

**E. Risk Factors** ........................................................................ 20

**F. Other Provisions of the Plan** ....................................................... 21

1. Executory Contracts and Unexpired Leases ......................................... 21
   a. Assumptions ........................................................................ 21
   b. Rejections .......................................................................... 21
2. Changes in Rates Subject to Regulatory Commission Approval .................... 21
3. Retention of Jurisdiction ............................................................. 21

**G. Tax Consequences of Plan** .......................................................... 21

**IV. CONFIRMATION REQUIREMENTS AND PROCEDURES** ..................... 21

**A. Who May Vote or Object** ............................................................ 22

1. Who May Object to Confirmation of the Plan ...................................... 22
2. Who May Vote to Accept/Reject the Plan ........................................... 22
   a. What Is an Allowed Claim/Interest ............................................... 22
   b. What Is an Impaired Claim ....................................................... 23
3. Who Is Not Entitled to Vote ......................................................... 23
4. Who Can Vote in More Than One Class ............................................. 24
5. Votes Necessary to Confirm the Plan ................................................ 24
6. Votes Necessary for a Class to Accept the Plan .................................... 24
7. Treatment of Nonaccepting Classes ................................................. 24
8. Request for Confirmation Despite Nonacceptance by Impaired Class(es) .......... 25

**B. Liquidation Analysis** ................................................................ 25

**C. Feasibility** ........................................................................... 27

**V. EFFECT OF CONFIRMATION OF PLAN** ............................................ 28

ii.

A.  Discharge ................................................................ 28

B.  Revesting of Property in the Debtor ................................. 28

C.  Modification of Plan .................................................. 28

D.  Post-Confirmation Status Report ..................................... 29

E.  Quarterly Fees ....................................................... 29

F.  Post-Confirmation Conversion/Dismissal .............................. 29

G.  Final Decree ......................................................... 30

VI. DECLARATION OF RICHARD J. MERRITT .................................. 30

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

iii.

**I.**

## INTRODUCTION

Varner Business Park, a California Limited Liability Company, is the Debtor and Debtor-in-Possession in this Chapter 11 bankruptcy case (the "Debtor"). On July 14, 2009 the Debtor commenced a bankruptcy case by filing a voluntary Chapter 11 petition under the United States Bankruptcy Code ("Bankruptcy Code"), found at 11 U.S.C. Section 101 et seq. Chapter 11 allows the Debtor, and under some circumstances, creditors and other parties in interest, to propose a plan of reorganization (the "Plan"). The Plan may provide for the Debtor to reorganize by continuing to operate, to liquidate by selling assets of the estate, or a combination of both. The Debtor is the party proposing the Plan sent to you in the same envelop as this document. THE DOCUMENT YOU ARE READING IS THE DISCLOSURE STATEMENT FOR THE ENCLOSED PLAN.

This is a reorganizing Plan which provides for the payment of creditors of the Debtor over time as indicated in the treatment of creditors more particularly described below. In other words, the Debtor as Plan Proponent seeks to accomplish payments under the Plan by paying creditors over time out of proceeds from the sale of land parcels owned by the Debtor, in order to pay the Allowed claims of creditors in an efficient fashion. The Effective Date of the proposed Plan is *no more than 60 days* after the date of the entry of an order confirming this Plan (the "Confirmation Date").

**A.  Purpose of This Document**

This Disclosure Statement summarizes what is in the Plan, and tells you certain information relating to the Plan and the process the Bankruptcy Court follows in determining whether or not to confirm the Plan.

## READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO KNOW ABOUT:

**(1)  WHO CAN VOTE OR OBJECT**

(2) WHAT THE TREATMENT OF YOUR CLAIMS IS, (i.e., what your claim will receive if the Plan is confirmed) AND HOW THIS TREATMENT COMPARES TO WHAT YOUR CLAIM WOULD RECEIVE IN LIQUIDATION,

(3) THE HISTORY OF THE DEBTOR AND SIGNIFICANT EVENTS DURING THE BANKRUPTCY,

(4) WHAT THINGS THE COURT WILL LOOK AT TO DECIDE WHETHER OR NOT TO CONFIRM THE PLAN,

(5) WHAT IS THE EFFECT OF CONFIRMATION, AND

(6) WHETHER THIS PLAN IS FEASIBLE.

This Disclosure Statement cannot tell you everything about your rights. You should consider consulting your own lawyer to obtain more specific advice on how this Plan will affect you and what is the best course of action for you.

Be sure to read the Plan as well as the Disclosure Statement. If there are any inconsistencies between the Plan and the Disclosure Statement, the Plan provisions will govern.

The Code requires a Disclosure Statement to contain "adequate information" concerning the Plan. The Bankruptcy Court (the "Court") has approved this document as an adequate Disclosure Statement, containing enough information to enable parties affected by the Plan to make an informed judgment about the Plan. Any party can now solicit votes for or against the Plan.

B. **Deadlines for Voting and Objecting: Date of Plan Confirmation Hearing**

THE COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT. IN OTHER WORDS, THE TERMS OF THE PLAN ARE NOT YET BINDING ON ANYONE. HOWEVER, IF THE COURT LATER CONFIRMS THE PLAN, THEN THE PLAN WILL BE BINDING ON ALL CREDITORS AND INTERST HOLDERS IN THIS CASE.

1     **1.  Time and Place of the Confirmation Hearing**

2     The hearing where the Court will determine whether or not to confirm the Plan will take place

3     on _____, 2010 at __:____.m. in Courtroom ____, United States Bankruptcy Court, 3420

4     Twelfth Street, Los Angeles, Ca. 900__ __.

5     **2.  Deadline For Voting For or Against the Plan**

6

7     If you are entitled to vote, it is in your best interest to timely vote on the enclosed ballot and

8     return the ballot in the enclosed envelope to William L. Conti, Esq., 330 Rancheros Drive, Ste. 212,

9     San Marcos, CA 92069-2978.

10     Your ballot must be received by counsel to the Debtor by 5:00 p.m. on _____, 2010 or

11     it will not be counted.

12

13     **3.  Deadline For Objecting to the Confirmation of the Plan**

14     Objections to the confirmation of the Plan must be filed with the Court and served upon

15     William L. Conti, Esq., 330 Rancheros Drive, Ste. 212, San Marcos, CA 92069-2978, counsel to the

16     Debtor, by 5:00 p.m. on _____, 2010.

17     **4.  Identity of Person to Contact for More Information Regarding the Plan**

18

19     Any interested party desiring further information about the Plan should contact William L.

20     Conti, Esq., 330 Rancheros Drive, Ste. 212, San Marcos, CA 92069-2978, counsel to the Debtor.

21     **C.  Disclaimer**

22     The financial data relied upon in formulating the Plan is based on the Debtor's books and

23     records and the Schedules filed in this case. The information contained in this Disclosure Statement is

24     provided by the Debtor, including the financial projection prepared by the Debtor that is attached

25     hereto as Exhibit B. The Plan Proponent represents that everything stated in the Disclosure Statement

26     is true to the Proponent's best knowledge. The Court has not yet determined whether or not the Plan is

27     confirmable and makes no recommendation as to whether or not you should support or oppose the

1    Plan.

2

## II.

3

## BACKGROUND

4

**A.    Description and History of the Debtor's Business**

5

On or about February 16, 2001, the Debtor was formed as a California Limited Liability Company by

the filing of Articles of Organization in the office of the Secretary of State of California under the name

"Brandi's U.S.A., LLC" ("Brandi's"). Thereafter, Brandi's acquired certain real property located on Watt

Court, in the City of Thousand Palms, County of Riverside, State of California (hereinafter the "Real

Property"). The Real Property consisted of raw land and was the sole asset of Brandi's. On or about

December 31, 2004 an Amended and Restated Operating Agreement was entered into by the members of

Brandi's pursuant to which the name of the Debtor was changed to Varner Business Park, LLC.

On or about March 2, 2005, the Debtor caused to be filed Restated Articles of Organization in the office

of the Secretary of State of the State of California reflecting the change in name. As of said date, the sole

members of the Debtor were:  (i) an entity known as 649205 B.C. Ltd, a British Columbia Corporation

controlled by an individual named R. Cameron Watt ("Watt"); and (ii) an individual named Richard J.

Merritt ("Merritt"). Watt and Merritt were, and are now, the sole managers for the Debtor in their

individual capacities.

Pursuant to the Amended and Restated Operating Agreement, the sole purpose of the Debtor was to act

as the general partner of an entity known as Varner Business Park, LP, a California Limited Partnership

("VBPLP") that intended to develop the Real Property into an industrial park.  Pursuant to the Amended

and Restated Operating Agreement, the Debtor was to hold legal title to the Real Property in trust for the

benefit of VBPLP.  Commencing in or about June, 2005, Watt and Merritt sought to obtain financing in

order to subdivide the Real Property into multiple parcels, and to construct improvements to the Real

Property to develop it into an industrial park. The Debtor, Watt and Merritt submitted an application for

such a loan from secured creditor Bridge Bank. N. A. ("Bridge Bank"). At the time of submitting the application, title of the Real Property remained vested in Brandi's.

In December 2005, Bridge Bank entered into certain agreements with the Debtor to provide the construction loan funds for the development of the Real Property as herein alleged. Included among the agreements were: 1). A Construction Loan Agreement; 2). A promissory note in the principal sum of $2,756,000.00 (the "Note"); and 3). A deed of trust securing the Note. Pursuant to the Note, the original maturity date for the loan was to be September 21, 2006. Concurrently, the individuals Watt and Merritt were required to and did execute a separate written agreement entitled "Commercial Guaranty" which purported to be the personal guarantee of the individuals for the loan purportedly being made to the Debtor.

Thereafter, an escrow was opened at Chicago Title Company for the consummation of the loan transaction as part of which title to the Real Property was transferred from Brandi's to the Debtor. Escrow thereafter closed on or about January 20, 2006. From and after the date of closing, the Debtor undertook and completed the subdivision of the Real Property into multiple parcels and the construction of the improvements to the Real Property, and began to offer the individual lots within the Real Property for sale.

The Real Property is uniquely located just north of Interstate 10 at the Ramon Rd. exit. Accessibility and visibility are prime. The entire development was divided into 16 separate lots (the "Lots"). All off-site development is complete. The Debtor was successful in selling 5 Lots between November 2006 and March, 2008 for a gross sales price of $2,040,234.00 and from which the Debtor paid to Bridge Bank the entire proceeds, less sales commissions and costs of sale in the approximate amount of $1,918,000.00 in payment on the Loan. The construction of a new interchange at Ramon Road and Bob Hope Drive has begun as at February 3rd, 2010, and replaces the old interchange further to the east. The new interchange provides Varner Business Park with vastly improved access to the interstate which will increase both

visibility and desirability of the Lots. There is a considerable lack of similar "ready to build" industrial

Lots available in the areas surrounding the Real Property. There is one sale that is in negotiations subject

to meeting the requirements of the Court to obtain approval.

**B.      Principals/Affiliates of Debtor's Business**

The principals of the Debtor's business are Richard J. Merritt, an individual 50% owner of the

membership interests and R. Cameron Watt as owner through 649205 B.C. limited as to a 50%

interest. There are no affiliates of the Debtor.

**C.      Management of the Debtor Before and After the Bankruptcy Filing**

The Debtor is managed on a day-to-day basis by Richard J. Merritt and R. Cameron Watt both

before and after the filing of the Bankruptcy case. The foregoing persons have not been compensated

during the case.

**D.      Events Leading to Chapter 11 Filing**

The following is a summary of the circumstances that <u>led to the filing</u> of this Chapter 11 case:

Beginning in late 2006 the national economy and the local state economy began to recede, and

continued to recede in epic proportions through December of 2008 to the extent that it became a national

crisis, which national crisis deterred and/or prevented the Debtor from realizing sales of the developed

Lots on the Real Property in order to pay down and/or satisfy the loan obligations to Bridge Bank as

alleged herein.

Between March 2006 and through December 2008 the Debtor worked with Bridge Bank to extend the

term of the loans several times through a series of "Change in Terms Agreement", most of which required

additional capital infusion which the Debtor did not have. These payments were made by the Debtor

through the individuals Watt and Merritt. In December, 2008 the Debtor continued to negotiate to further

extend the term of the loan to allow the real property market to rebound. However, despite representations

to the contrary, Bridge Bank refused to provide Plaintiff with an extension of the loan on the terms

represented, requiring instead that Plaintiff agree to pay a substantially larger "pay down" of the principal balance of the loan, an interest rate equal to 12% per annum (rather than 7% per annum as previously represented), and an exorbitant extension fee.

On or about March 16, 2009, Bridge Bank commenced a non-judicial foreclosure proceeding on the Real Property. On or about April 8, 2009, Bridge Bank also commenced an action in the Superior Court of California, County of Santa Clara against the individuals Watt and Merritt, entitled <u>Bridge Bank NA v. Richard J. Merritt, et. al.,</u> case # 1-09-CV-139485 (the Superior Court Action"). In the Superior Court Action, Bridge Bank seeks recovery against both Watt and Merritt for the outstanding balance due under the Note pursuant to the purported written guaranties executed by them. The Debtor is not named as a party to that action.

On or about July 7, 2009, Bridge Bank was proceeding towards a Trustee's Sale on the Real Property. The Debtor thus filed this Petition prior to the date of the sale in order to preserve its rights therein through this proceeding.

**E.**     **Significant Events During the Bankruptcy**

   **1. Bankruptcy Proceedings**

   The following is a chronological list of significant events, which have occurred during this case:

- The Debtor filed its Schedules and Statement of Financial Affairs on July 14, 2009, and Amended Schedule F on February 14, 2010.

- The examination of the Debtor under 11 U.S.C. Section 341(a) was held and concluded on August 25, 2009.

- The Court has not set the last date for the filing of claims (a "bar date") in the case. Notice of any Order setting a bar date will be sent to creditors and parties in interest when obtained.

- On or about August 3, 2009. Secured Creditor Bridge Bank levied upon an account maintained by Mr. Merritt at Wells Fargo Bank pursuant to the Writ of Attachment issued in the Superior Court Action, thereby constituting an "action" under the Note.

- Secured Creditor Bridge Bank filed a Motion for Relief From Automatic Stay on August 21, 2009. The Motion was partially denied without prejudice and continued to December 3, 2009 for hearing on whether the Real Property was declining in value.

- On October 16, 2009. Secured Creditor Bridge Bank filed a Motion to determine that the case is a "Single Asset Case" subject to U.S.C. Section 362(d)(3). The hearing was continued to January 14, 2010 and was granted at that hearing.

- On November 11, 2009 the Debtor filed a Motion requesting authority to sell Lot 10 to a third party buyer. The hearing on this Motion was continued to January 14, 2010 and was denied.

- On December 2, 2009, the Debtor filed Adversary Proceeding No. 6:09-ap-01705 against Secured Creditor Bridge Bank seeking Declaratory Relief and Injunctive Relief based upon a violation of the "One-action Rule" set forth in California Code of Civil Procedure Section 726. That Adversary Proceeding is set for Status Conference on February 24, 2010 and is still pending in this case.

- On January 14, 2010, the Court denied Secured Creditor Bridge Bank's Motion for Relief from Stay and/or Request for Adequate Assurance payments, without prejudice.

- On February 15, 2010 the Debtor filed an Amended Schedule F adding four additional unsecured claims.

2. **Other Legal Proceedings**

The Debtor is not involved in any other litigation. The Principals of the Debtor continue to be involved in the State Court Action referred to above.

**3. Actual and Projected Recovery of Preferential or Fraudulent Transfers**

The Debtor believes that the holders of general unsecured claims in Class 5 will be paid in full over time. The Debtor believes that there are no viable avoidance actions pursuant to 11 U.S.C. Sections 544, 547, 548 and 550 in this case.

**4. Procedures Implemented to Resolve Financial Problems**

The Debtor feels it had the rug pulled out from under it in negotiations of the terms of extending the loan from Secured Creditor Bridge Bank. The Debtor remains convinced that with the slowly recovering real estate market and economy that sales of the Lots will increase as will the prices to be realized from sale. Debtor believes that time will resolve the Debtors financial problem by allowing it time to repay its debt. The Debtor's Real Property is not declining in value and the market for these Lots is showing signs of recovery.

**5. Current Financial Condition of the Debtor.**

The identity and fair market value of the estate's assets are listed in Exhibit A, which consist of Schedules A and B on file in this case, as amended. The Debtor believes that the value of its Real Property is in excess of all debt secured thereby. The Debtor believes that it will generate sufficient cash to make the payments called for under the Plan.

**III.**

**SUMMARY OF THE PLAN OF REORGANIZATION**

**A.    What Creditors and Interest Holders Will Receive Under the Proposed Plan**

As required by the Bankruptcy Code, the Plan classifies claims and interests in various classes according to their right to priority. The Plan states whether each class of claims or interests is impaired or unimpaired. The Plan provides the treatment each class will receive.

**B.    Unclassified Claims**

Certain types of claims are not placed into voting classes; instead they are unclassified. They

are not considered impaired and they do not vote on the Plan because they are automatically entitled to specific treatment provided for them in the Bankruptcy Code. As such, the Proponent has <u>not</u> placed the following claims in a class. The treatment of these claims is provided below.

## 1. **Administrative Expenses**

Administrative expenses are claims for costs of expenses of administering the Debtors' Chapter 11 case, which are allowed under Code Section 507(a)(1). The Code requires that all administrative claims be paid on the Effective Date of the Plan, unless a particular claimant agrees to a different treatment. There are no administrative expenses under Section 507(b) of the Code.

The following chart lists <u>all</u> of the Debtors' Section 507(a)(1) administrative claims and their treatment under this Plan.

| <u>Name</u> | **Amount Owed** | <u>Treatment</u> | | |
|---|---|---|---|---|
| William L. Conti, Esq. (Counsel to Debtor) | Estimate $25,000.00 | Paid in Full on Effective Date | | |
| Clerk's Office Fees | To be determined | Paid in Full on Effective Date | | |
| Office of the U.S. Trustee Fees | To be determined | Paid in Full on Effective Date | | |
| TOTAL | To be determined | | | |

<u>Court Approval of Professional Fees Required</u>:

The Court must rule on all fees listed in this chart before the fees will be owed. For all fees except Clerk's Office fees and U.S. Trustee's fees, the professional in question must file and serve a properly noticed fee application and the Court must rule on the application. Only the amount of fees allowed by the Court will be required to be paid under this Plan.

As indicated above, the Debtor will need to pay administrative claims on the Effective Date of the Plan unless the claimant has agreed to be paid later or the Court has not yet ruled on the claim. As indicated elsewhere in this Disclosure Statement, the Debtor will have on hand sufficient cash to pay

those claims.

## 2. **Priority Tax Claims**

Priority tax claims include certain unsecured income, employment and other taxes described by Code Section 507(a)(8). The Code requires that each holder of such a Section 507(a)(8) priority tax claim receive the present value of such claim in deferred cash payments, over a period not exceeding six years from the date of the assessment of such tax. The Debtor does not believe it has any Section 507(a)(1) priority tax claims and their treatment under this Plan.

## C. **Classified Claims and Interests**

### 1. **Classes of Secured Claims**

Secured claims are claims secured by liens on property of the estate. The following chart lists all classes containing Debtors' secured pre-petition claims and their treatment under this Plan (see Exhibit C for further information about each secured claim):

| CLASS # | DESCRIPTION | INSIDER (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---------|-------------|---------------|----------------|-----------|
| 1 | Secured Claim of: *Bridge Bank, NA*<br><br>Collateral Description: *Real property located at 72018, et. al., Watt Court, Thousand Palms, Ca. (See Schedule "A").*<br><br>Priority of Security Interested: *First priority Deed of Trust (Disputed).*<br><br>Principal Owed: *$1,290,058.30.* | No. | Yes. | • The status of this secured claim is in dispute and results in the treatment of this claim being contingent on the outcome of this dispute.<br><br>• Debtor has filed Adversary Proceeding No. 6:09-ap-01705 against secured creditor asserting that secured creditor has lost its security interest by violating the one-action rule of California Code of Civil procedure |

| CLASS # | DESCRIPTION | INSIDER (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---------|-------------|---------------|----------------|-----------|
| | Pre-petition arrearage amount: *$168,114.52 (Disputed)* | | | Section 726. Thus, the validity of secured creditor's claim must be determined first in the Adversary Proceeding.<br><br>• The Debtor proposes that the Adversary Proceeding be litigated to conclusion on a schedule to be determined by the Court. While the action is pending, the Debtor proposes to sell Lot 10 to an existing proposed purchaser in a transaction approved by the Court which will net the Debtor $100,000.00 cash, less commissions and closing costs, and a secured promissory note. The Debtor further proposes that 100% of the net cash sale price be deposited with the Court or in an agreeable interest bearing account pending the outcome of the litigation. The debtor further proposes that the Debtor be entitled retain the payments made under the secured promissory note from the sale of Lot 10 to pay legal |

| CLASS # | DESCRIPTION | INSIDER (Y/N) | IMPAIRED (Y/N) | TREATMENT | |
|---------|-------------|---------------|----------------|-----------|--|
| | | | | expenses, marketing costs of the Debtor, and ongoing costs (insurance and property taxes). | |
| | | | | • If Secured Party Bridge Bank is determined to be an unsecured creditor, their allowed Claim shall be paid in the same manner as the Class 4 Unsecured Creditors and the funds held on deposit by the Court will be distributed in the manner provided by this Plan. | |
| | | | | • If the secured party's claim is valid, then the beginning principal balance and outstanding unpaid interest will be determined by the Court, not to include default interest or other charges, less any payments received. | |
| | | | | • The sum determined by the Court will be payable over a five (5) year term from sales of the remaining Varner Business Park lots at specified "release prices" to be determined by the Court subject to interest adjustments, | |

| CLASS # | DESCRIPTION | INSIDER (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---------|-------------|---------------|----------------|-----------|
| | | | | until paid in full. |
| | | | | • The Debtor shall use the proceeds from a sale of any Lot over the "release price" to pay the Allowed Claim of the Class 2 Secured Creditor, below. |
| | | | | • Interest rate shall be the "prime rate" as of the commencement of the Plan, plus a risk adjustment of ¾%, with a final interest rate to be no more than 5.5% per annum. No monthly payments shall be required. |
| 2 | Secured Claim of: *R. P. Wages* Collateral Description: *Real property located at 72018, et. al., Watt Court, Thousand Palms, Ca. (See Schedule "A").* Priority of Security Interested: *Second priority Deed of Trust (Disputed).* Principal Owed: *$205,500.00.* Pre-petition | No | Yes | • The beginning principal balance and outstanding unpaid interest to this Secured Creditor will be determined by the Court, not to include default interest or other charges, less any payments received. • The sum determined by the Court will be payable over a five (5) year term from sales of the Varner Business Park Lots after payment in full of the Class 1 Secured Claim (if valid), from the remaining proceeds |

| CLASS # | DESCRIPTION | INSIDER (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---------|-------------|---------------|----------------|-----------|
| | arrearage amount: *$ TBD* <br><br> *(Disputed)* | | | of each sale of a Lot after payment of the "release price" to the Class 1 Secured Creditor (if any) subject to interest adjustments until paid in full. <br><br> • Interest rate shall be the "prime rate" as of the commencement of the Plan, plus a risk adjustment of ¾ %, with a final interest rate to be no more than 5.5%. No monthly payments shall be required. |
| 3 | Secured Claim of: <br><br> *Riverside County Tax Collector* <br><br> Collateral Description: <br><br> *Real property located at 72018, et. al., Watt Court, Thousand Palms, Ca. (See Schedule "A").* <br><br> Priority of Security Interested: *Third priority secured property taxes.* <br><br> Principal Owed: *$8,000.00.* <br><br> Pre-petition arrearage amount: | No | No | • This secured party's claim will be determined by the Court, not to include default interest or other charges, less any payments received. <br><br> • The sum determined by the Court will be payable prorata at closing of each sale of any lot within the project. <br><br> • Interest rate shall be the "prime rate" as of the commencement of the Plan, plus a risk adjustment, with a final interest rate to be no more than 5.5%. No monthly payments shall be |

| CLASS # | DESCRIPTION | INSIDER (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---------|------------|---------------|----------------|-----------|
| | *$ 8,000*<br><br>Post Petition arrearage amount:<br><br>*TBD*<br><br>Total Claim Amount:<br><br>*$8,000.00* | | | required. |

**2.   Classes of Priority Unsecured Claims**

Certain priority claims that are referred to in Code Sections 507(a)(3),(4),(5),(6), and (7) are required to be placed in classes. These types of claims are entitled to priority treatment as follows: the Code requires that each holder of such claim receive cash on the Effective Date equal to the allowed amount of such claim. However, a class of unsecured priority claim holders may vote to accept deferred cash payments of a value, as of the Effective Date, equal to the allowed amount of such claims. The Debtor believes that it has no such claim holders.

**3.   Classes of General Unsecured Claims**

General unsecured claims are unsecured claims not entitled to priority under Code Section 507(a). The following chart identifies this Plan's treatment of the one class of Debtor's general unsecured claims (see Exhibit I for further information about each general unsecured claim):

| CLASS # | DESCRIPTION | INSIDER (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---------|------------|---------------|----------------|-----------|
| 4 | General Unsecured Creditors<br><br>Estimated amount of Undisputed Claims:<br>*$15,000.00*<br><br>Estimated amount of Disputed | No. | Yes. | • Allowed Claims in this Class will be paid 100% of the principal amount of the Allowed Claims in the fashion described below.<br><br>• Once the Secured Creditors are paid in |

| CLASS # | DESCRIPTION | INSIDER (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---------|-------------|---------------|----------------|-----------|
|         | Claims: $ 66,746.00 | | | full from the proceeds of sales of the Lots, the holders of Allowed Claims in this class will share the net sales proceeds pro-rata from each subsequent sale until paid in full of their Allowed Claim, plus interest at the Prime Rate from the Petition Date. |

### 4.  Class of Interest Holders

Interest holders are parties who hold ownership interests (i.e., equity interests) in the Debtor.  If the Debtor is a corporation, entities holding preferred or common stock in the Debtor are interest holders.  If the Debtor is a partnership, the interest holders include both general and limited partners.  If the Debtor is an individual, the Debtor is the interest holder.  The following chart identifies this Plan's treatment of the class of interest holders:

| CLASS # | DESCRIPTION | INSIDER (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---------|-------------|---------------|----------------|-----------|
| 5 | Interest Holders | Yes | No | • Retain interests in all properties of the Estate. |

## D.   Means of Performing the Plan

### 1.   Funding for the Plan

The Plan will be funded by the following: The Debtor will aggressively market the subject property and continue to solicit offers for the purchase of the remaining 10 individual Lots. The Debtor continues to work with a Buyer who is under contract but to whom the Court has not approved the sale. The Debtor expects to resolve the issue so that a Sale can occur with all cash at closing. All funding

will come from the sales of the Lots.

## 2. Post-Confirmation Management

The same members of the Debtor who have performed services both before and after the filing of the case shall continue to oversee the management of its post-confirmation business affairs in order to assure that the Debtor will fully perform under the Plan.

## 3. Disbursing Agent

The Reorganized Debtor shall act as the disbursing agent for the purpose of making all distributions provided for under the Plan. The Reorganized Debtor as the Disbursing Agent shall serve without bond.

## 4. Payment of Professionals' Fees and Expenses After Confirmation Date

Any professional employed by the Debtor after the Confirmation Date shall be entitled to obtain payment of its fees and costs as a post-confirmation expense of the Reorganized Debtor without the need for any further order of the Bankruptcy Court with respect thereto.

## 5. Compromises of Claims or Controversies

From and after the Confirmation Date the Reorganized Debtor shall be entitled to compromise any Claim or controversy, pursuant to Stipulation and Order of the Bankruptcy Court with respect thereto without the need for notice and a hearing.

## 6. Disputed Claims

The Debtor in this case disputes the claim of Secured Creditor Bridge Bank and has filed an Adversary Proceeding to determine this dispute. In the case of this disputed claim, and any other claim that is disputed by the Debtor (a "Disputed Claim"), the holder of the Disputed Claim shall receive no distribution under the Plan unless such creditor timely filed a proof of claim prior to the bar date or unless and until the Disputed Claim is allowed by a Final Order of the Bankruptcy Court that is not subject to an appeal. Pending the entry of any Final Order allowing a disputed claim, all distributions

allocable to such Disputed Claim shall be deposited into an interest bearing segregated bank account at a financial institution authorized by the U.S. Trustee Guidelines (the "Disputed Claims Reserve"). No disbursement shall be made from the Disputed Claims Reserve without the written consent of the Debtors and the holder of the Disputed Claim, or by order of the Bankruptcy Court.

In the event that a Final Order is entered allowing a Disputed Claim and is not subject to an appeal, within five days thereafter the amount reserved in the Disputed Claims Reserve on account of such Allowed Claim shall be disbursed to the holder of such Allowed Claim, and any further distributions on account of such Allowed Claim shall be paid directly to the holder of the Allowed Claim in an aggregate amount not to exceed the amount of the Allowed Claim.

## 7. **Objections to Disputed Claims**

The Debtor shall have the right to file and prosecute objections to any Disputed Claims after the Confirmation Date. Objections to any Disputed Claim shall be filed by sixty (60) days after the Effective Date. To the extent that the Debtor has initiated an action against a claimant in a State or Federal Court such action shall be <u>deemed to constitute an objection to any Disputed Claim</u> without the need for the filing of any action in the Bankruptcy Court. The Bankruptcy Court may extend the time for objecting to Disputed Claims for cause shown, upon motion made after such notice as the Bankruptcy Court may deem appropriate.

The investigation into claims is ongoing and will continue after the Confirmation Date. As a result, Creditors and parties-in-interest are hereby specifically advised that, notwithstanding that the existence of any particular objection to Claim may not be listed, disclosed or set forth in the Plan or Disclosure Statement, an objection to a claim may be filed against a claimant at any time, subject to the claims objections limitations set forth hereinabove.

## 8. **Unclaimed Distributions**

Each Claimant shall provide to the Debtor written notice of any change of address from the

address of the Claimant set forth in the Schedules or in any Proof of Claim filed by the Claimant. The Debtor shall be entitled to rely upon the address for the Claimant set forth in the Schedules or in any Proof of Claim filed by the Claimant, and shall not be required to perform any investigation or inquiry as to the proper address for such Claimant if the address stated in the Schedules or in the Proof of Claim is incorrect. Any unclaimed Distribution ("Unclaimed Distribution") provided for under the Plan (which shall include (i) checks which have been returned as undeliverable without a proper forwarding address, (ii) checks which were not mailed or delivered because of the absence of a proper address to which to mail or deliver the same or (iii) checks which remain unclaimed for a period of ninety (90) days) shall be deposited by the Debtor into an unclaimed property reserve ("Unclaimed Property Reserve") to be held in trust for the benefit of holders of Allowed Claims entitled thereto under the terms of the Plan. For the earlier to occur of (i) one (1) year after an Unclaimed Distribution is deposited into the Unclaimed Property Reserve or (ii) ninety (90) days after the making of the Final Distribution to be made to any Creditor under the Plan (the "Unclaimed Property Holding Period") such Unclaimed Distribution shall be held in the Unclaimed Property Reserve for the benefit of the holders of Allowed Claims who failed to previously claim such Unclaimed Distribution. Any holder of an Allowed Claim entitled to an Unclaimed Distribution may request payment from the Debtor; provided, however that after the expiration of the Unclaimed Property Holding Period, such Unclaimed Distribution shall be refunded to the Reorganized Debtor for its use to the extent still required under the Plan, and the holders of Allowed Claims otherwise entitled to said Unclaimed Distribution shall cease to be entitled thereto and their claims based thereon shall be deemed waived and forever barred.

**E.  Risk Factors**

The primary risk under the Plan is that the Debtor's anticipated funding from the sale of Lots may take longer than anticipated in order to meet payment benchmarks set forth under the Plan. In that event, there would be a default under the Plan.

### F. **Other Provisions of the Plan**

#### 1. **Executory Contracts and Unexpired Leases**

##### a. **Assumptions**

There are no unexpired leases or executory contracts to be assumed as obligations of the Reorganized Debtor under this Plan.

##### b. **Rejections**

The Debtor believes that there are no executory contracts or unexpired leases that are to be rejected under this Plan.

#### 2. **Changes in Rates Subject to Regulatory Commission Approval**

The Debtor is not subject to governmental regulatory commission approval of rates.

#### 3. **Retention of Jurisdiction**

The Court will retain jurisdiction to the extent required by the Plan.

### G. **Tax Consequences of Plan**

CREDITORS AND INTERST HOLDERS CONCERNED WITH HOW THE PLAN MAY AFFECT THEIR TAX LIABILITY SHOULD CONSULT WITH THEIR OWN ACCOUNTANTS, ATTORNEYS, AND/OR ADVISORS. The following disclosure of possible tax consequences is intended solely for the purpose of alerting readers about possible tax issues this Plan may present to the Debtor. The Proponent CANNOT and DOES NOT represent the Tax Code consequence contained below are the only tax consequences of the Plan because the Tax Code embodies many complicated rules which make it difficult to state completely and accurately all the tax implications of any action.

The following are the tax consequences which the Plan will have on the Debtor's tax liability: The Debtor believes that there will be no adverse tax impact upon the Debtor under its Plan.

**IV.**

## **CONFIRMATION REQUIREMENTS AND PROCEDURES**

PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OF THIS PLAN SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON CONFIRMING A PLAN OF REORGANIZATION IS VERY COMPLEX. The following discussion is intended solely for the purpose of alerting readers about basic confirmation issues, which they may wish to consider, as well as certain deadlines for filing claims. The Proponent CANNOT or DOES NOT represent that the discussion contained below is a complete summary of the law on this topic.

Many requirements must be met before the Court can confirm a Plan. Some of the requirements include that the Plan must be proposed in good faith, acceptance of the Plan, whether the Plan pays creditors at least as much as creditors would receive in a Chapter 7 liquidation, and whether the Plan is feasible. These requirements are <u>not</u> the only requirements for confirmation.

## A. Who May Vote or Object

### 1. Who May Object to Confirmation of the Plan

Any party in interest may object to the confirmation of the Plan, but as explained below not everyone is entitled to vote to accept or reject the Plan.

### 2. Who May Vote to Accept/Reject the Plan

A creditor or interest holder has a right to vote for or against the Plan if that creditor or interest holder has a claim which is both (1) allowed or allowed for voting purposes and () classified in an impaired class.

#### a. What Is an Allowed Claim/Interest

As noted above, a creditor or interest holder must first have an allowed claim or interest to have the right to vote. Generally, any proof of claim or interest will be allowed, unless a party in interest brings a motion objecting to the claim. When an objection to a claim or interest is filed, the creditor or interest holder holding the claim or interest cannot vote unless the Court, after notice and hearing, either overrules the objection or allows the claim in an amount set by the Court for voting purposes.

THE BAR DATE FOR FILING A PROOF OF CLAIM IN THIS CASE HAS NOT YET BEEN SET. A creditor or interest holder may have an allowed claim or interest even if a proof of claim or interest is not timely filed. A claim is deemed allowed if (1) it is scheduled on the Debtor's schedules and such claim is not scheduled as disputed, contingent, or unliquidated, and (2) no party in interest has objected to the claim. An interest is deemed allowed if it is scheduled and no party in interest has objected to the interest. Consult Exhibits G through I and Exhibit K to this Disclosure Statement to see how the Proponent has characterized your claims.

### b.   What Is an Impaired Claim

As noted above, an allowed claim only has the right to vote if it is in a class that is _impaired_ under the Plan. A class is impaired if the Plan alters the legal, equitable, or contractual rights of the members of that class. For example, a class comprised of general unsecured claims is impaired if the Plan fails to pay the members of that class 100% of what they are owed.

In this case, the Proponent believes that Classes 1, 2, and 4 are impaired and that holders of claims in each of these classes are therefore entitled to vote to accept or reject the Plan. The Proponent believes that Class 3 is unimpaired and that holder of a claim in that class therefore does not have a right to vote to accept or reject the Plan. Parties who dispute the Proponent's characterization of their claim or interest as being impaired or unimpaired may file an objection to the Plan contending that the Proponent has incorrectly characterized the class.

### 3.   Who Is Not Entitled to Vote

The following four types of claims are not entitled to vote: (1) claims that have been disallowed; (2) claims in unimpaired classes; (3) claims entitled to priority pursuant to Code sections 507(a)(1), (a)(2), and (a)(8), and (4) claims in classes that do not receive or retain any value under the Plan. Claims in unimpaired classes are not entitled to vote because such classes are deemed to have accepted the Plan. Claims entitled to priority pursuant to Code section 507(a)(1), (a)(2), and (a)(7) are

not entitled to vote because such claims are not placed in classes and they are required to receive certain treatment specified by the Code. Claims in classes that do not receive or retain any value under the Plan do not vote because such classes are deemed to have rejected the Plan. EVEN IF YOUR CLAIM IS OF THE TYPE DESCRIBED ABOVE, YOU MAY STILL HAVE A RIGHT TO OBJECT TO THE CONFIRMATION OF THE PLAN.

### 4. Who Can Vote in More Than One Class

A creditor whose claim has been allowed in part as a secured claim and in part as an unsecured claim is entitled to accept or reject a Plan in both capacities by casting one ballot for the secured part of the claim and another ballot for the unsecured claim.

### 5. Votes Necessary to Confirm the Plan

If impaired classes exist, the Court cannot confirm the Plan unless (1) at least one impaired class has accepted the Plan without counting the votes of any insiders within that class, and (2) all impaired classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by "cramdown" on non-accepting classes, as discussed later in Section {IV. A.8}.

### 6. Votes Necessary for a Class to Accept the Plan

A class of claims is considered to have accepted the Plan if more than one-half (1/2 *in number* and at least two-thirds (2/3) *in dollar amount* of the claims which actually voted, voted in favor of the Plan. A class of interests is considered to have accepted the Plan if at least two-thirds (2/3) in amount of the interest-holders of such class which actually voted, voted to accept the Plan.

### 7. Treatment of Nonaccepting Classes

As noted above, even if <u>all</u> impaired classes do not accept the proposed Plan, the Court may nonetheless confirm the Plan so long as one impaired class accepts the Plan if the nonaccepting classes are treated in the manner required by the Code. The process by which nonaccepting classes are forced to be bound by the terms of a Plan is commonly referred to as "cramdown." The Code allows the Plan

to be "crammed down" on nonaccepting classes of claims or interests if it means all consensual

requirements except the voting requirements of 1129(a)(8) and if the Plan does not "discriminate

unfairly" and is "fair and equitable" toward each impaired class that has not voted to accept the Plan as

referred to in 11 U.S.C. Section 1129(b) and applicable case law.

### 8.    Request for Confirmation Despite Nonacceptance by Impaired Class(es)

The party proposing this Plan will ask the Court to confirm this Plan by cramdown on impaired

classes 1, 2, 3 and 5 if any of these classes do not vote to accept the Plan.

## B. Liquidation Analysis

Another confirmation requirement is the "Best Interest Test", which requires a liquidation

analysis. Under the Best Interest Test, if a claimant or interest holder is in an impaired class and that

claimant or interest holder does not vote to accept the Plan, then that claimant or interest holder must

receive or retain under the Plan property of a value not less than the amount that such holder would

receive or retain if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code.

In a Chapter 7 case, a Chapter 7 trustee usually sells the Debtor's assets. Secured creditors are

paid first from the sales proceeds of properties on which the secured creditor has a lien.

Administrative claims are paid next. Next, unsecured creditors are paid from any remaining sales

proceeds, according to their rights to priority. Unsecured creditors with the same priority share in

proportion to the amount of their allowed claim in relationship to the amount of total allowed

unsecured claims. Finally, interest holders receive the balance that remains after all creditors are paid,

if any.

For the Court to be able to confirm this Plan, the Court must find that all creditors and interest

holders who do not accept the Plan will receive at least as much under the Plan as such holders would

receive under a Chapter 7 liquidation. The Plan Proponent maintains that this requirement is met here

for the following reasons:

1    In a Chapter 7 case, a trustee is appointed and entitled to compensation from the bankruptcy

2    estate in an amount not to exceed 20% on the first $5,000 of all moneys disbursed (a fee of $1,000),

3    10% on any amount over $5,000 but less than $50,000 (a fee of $4,500), and 5% on any amount over

4    $50,000 but not in excess of $1 million (a fee of $47,500). In this case, it is not likely that a Chapter 7

5    Trustee would have any property to distribute because the real and personal property assets of the

6    Debtor are encumbered and it appears that in the event of foreclosure by the secured creditors there

7    would be no property for a Chapter 7 Trustee to distribute.

8    On the other hand, under the Plan the Debtor intends to make the payments called for

9    thereunder. It is in the best interests of the Class 4 General Unsecured Creditors for the Debtor to

10    continue in its effort to pay them since liquidation would likely not generate enough dollars to pay that

11    class in full. Creditors are invited to review Exhibit E which sets forth the analysis by the Debtor of

12    each asset listed in Exhibit A and details the reasons for the substantial difference in asset realization

13    value under the Chapter 11 Plan as compared to a Chapter 7 liquidation.

14    Below is a demonstration indicating that all creditors and interest holders will receive at least as

15    much under the Plan as such creditor or interest holder would receive under a Chapter 7 liquidation.

16    (See Exhibit E for an explanation of how the following assets are valued. This information is provided

17    by the Debtor.)

18    TOTAL ASSETS AT LIQUIDATION VALUE        $0

19    Less:

20    Chapter 7 trustee fees                                $nil

21    Chapter 7 trustee expenses                        $nil

22    Chapter 7 attorneys' fees—claims objections     $nil

23    Chapter 7 attorneys' fee —sale of assets          $nil

24    Chapter 7 accountants' fees—accounting/tax     $nil

| | | |
|---|---|---|
| 1 | Chapter 11 administrative expenses | $25,000+ |
| 2 | Priority claims, excluding administrative | |
| 3 | Expense claims. | |
| | Franchise Tax Board | $6,432.38 |
| 4 | Subtotal | $31,432+ |
| 5 | (1)Balance for unsecured claims after paying | |
| 6 | Administrative and priority claims | 0.00 |
| 7 | (2)Unsecured claims reconciliation | |
| | Undisputed Claims | $64,466.00 |
| 8 | Disputed Claims | $17,280.00 |
| 9 | Estimated total of unsecured claims | |
| 10 | In a Chapter 7 case because of breach | |
| | Of executor contract claims | $0 |

**% OF THEIR CLAIMS WHICH UNSECURED CREDITORS WOULD RECEIVE OR**

**RETAIN IN A CH. 7 LIQUIDATION:** Zero

**% OF THEIR CLAIMS WHICH UNSECURED CREDITORS (Class 4) WILL RECEIVE**

**UNDER THE DEBTORS'S PLAN:** 100% of principal.

**C.  Feasibility**

Another requirement for confirmation involves the feasibility of the Plan, which means that

confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial

reorganization, of the Debtor or any successor to the Debtor under the Plan, unless such liquidation or

reorganization is proposed in the Plan.

There are least two important aspects of a feasibility analysis. The first aspect considers

whether the Debtor will have enough cash on hand on the Effective Date of the Plan to pay all the

claims and expenses which are entitled to be paid on such date. The Plan Proponent maintains that this

aspect of feasibility is satisfied in that payments under the Plan shall come from the sales of Lots over

time and the proceeds of those sales being paid in orderly increments as provided in the Plan once the

1 | status of all claims is resolved.

2 | The second aspect considers whether the Proponent will have enough cash over the life of the

3 | Plan to make the required Plan payments. This aspect is met since the Debtor will be funding the plan

4 | through sales of Lots over time at a price that will ensure payment in full of all claims once all Lots are

5 | sold.

6 |

7 | YOU ARE ADVISED TO CONSULT WITH YOUR ACCOUNTANT OR FINANCIAL

8 | ADVISOR IF YOU HAVE ANY QUESTIONS PERTAINING TO THESE FINANCIAL

9 | STATEMENTS.

10 | In summary, the Plan proposes to pay all secured creditors in accordance with the terms of the

11 | Plan. The final Plan payments are expected to be paid by the 60th month after the Effective Date. The

12 | Plan Proponent contends that the payment program can be met. Furthermore, as discussed earlier in

13 | the Disclosure Statement at Section [II.E.4], the Debtor has implemented procedures to resolve its

14 | financial problems and have sufficient cash flow to make plan payments.

15 |

16 | **V.**

17 | **EFFECT OF CONFIRMATION OF PLAN**

18 | **A.  Discharge**

19 |

20 | This Plan provides that upon Plan confirmation, the Debtor shall be discharged of liability for

21 | payment of debts incurred before confirmation of the Plan, to the extent specified in 11 U.S.C. Section

22 | 1141. However, any liability imposed by the Plan will not be discharged.

23 | **B.  Revesting of Property in the Debtor**

24 |

25 | Except as provided in Section [IV.F], and except as provided elsewhere in this Plan, the

26 | confirmation of the Plan revests all of the property of the estate in the Debtor.

27 | **C.  Modification of Plan**

28 | The Proponent of the Plan may modify the Plan at any time before confirmation. However, the

1  Court may require a new disclosure statement and/or revoting on the Plan if the Plan Proponent

2  modifies the plan in a material fashion before confirmation.

3      The Proponent of the Plan may also seek to modify the Plan at any time after confirmation so

4  long as (1) the Plan has not been substantially consummated <u>and</u> (2) the Court authorizes the proposed

5
6  modifications after notice and a hearing.

7  **D.   Post-Confirmation Status Report**

8      Within 120 days of the entry of the order confirming the Plan, the Plan Proponent shall file a

9  status report with the Court explaining what progress has been made toward consummation of the

10  confirmed Plan. The status report shall be served on the United States Trustee, the twenty largest

11  unsecured creditors, and those parties who have requested special notice. Further status reports shall be

12
13  filed every 120 days and served on the same entities.

14  **E.   Quarterly Fees**

15      Quarterly fees accruing under 28 U.S.C. Section 1930(a)(6) to date of confirmation shall be

16  paid to the United States Trustee on or before the Effective Date of the Plan. Quarterly fees accruing

17  under 28 U.S.C. Section 1930(a)(6) after confirmation shall be paid to the United States Trustee in

18
19  accordance with 28 U.S.C. Section 1930(a)(6) until entry of a final decree, or entry of dismissal or

20  conversion to Chapter 7.

21  **F.   Post-Confirmation Conversion/Dismissal**

22      A creditor or party in interest may bring a motion to convert or dismiss the case under Section

23  1112(b), after the Plan is confirmed, if there is a default in performing the Plan. If the Court orders the

24  case converted to Chapter 7 after the Plan is confirmed, then all property that had been property of the

25  Chapter 11 estate, and that has not been disbursed pursuant to the Plan, will revest in the Chapter 7

26  estate. The automatic stay will be reimposed upon the revested property, but only to the extent that

27
28  relief from stay was not previously authorized by the Court during this case.

The order confirming the Plan may also be revoked under very limited circumstances. The Court may revoke the order if the order of confirmation was procured by fraud and if a party in interest brings an adversary proceeding to revoke confirmation within 180 days after the entry of the order of confirmation.

## G. Final Decree

Once the estate has been substantially consummated, the Plan Proponent, or other such party as the Court shall designate in the Plan Confirmation Order, may file a motion with the Court to obtain a final decree to close the case.

Dated:  February 15, 2010

WILLIAM L. CONTI, ESQ.

## VI.

## DECLARATION OF RICHARD J. MERRITT

I, Richard J. Merritt, first being duly sworn, do hereby declare and state as follows:

1. This Declaration is executed in support of the Disclosure Statement set forth above. All of the matters testified to herein are based upon my own personal knowledge, are true and correct and, if called upon to testify, I could testify competently thereto. I am one of the managers of the Debtor, which initiated this case by filing a voluntary petition under Chapter 11 of the United States Bankruptcy Code on July 14, 2009.

2. I have reviewed Debtor's Original Chapter 11 Plan ("Plan") and Debtor's Original Disclosure Statement Describing Debtor's Original Chapter 11 Plan ("Disclosure Statement"). This declaration is made in support of the approval of the Disclosure Statement.

3. The Debtor desires to implement in good faith the program for the payment of creditors under the Plan that it has filed in this case. As indicated in the Plan and the Disclosure Statement, under the Plan it will pay the claims of its secured and unsecured creditors in amounts far beyond what could be realized in a liquidation. I believe that it will only be through the Debtor's continued aggressive marketing and sales of the Lots in its possession actions that it is willing to undertake that the highest and best recoveries will be obtained.

4. It is in the best interests of the Class 4 General Unsecured Creditors for the Debtor to undertake the payment of their claims over time. In the event that this case is converted to one under Chapter 7, the only creditors that would receive a distribution would be the priority, administrative and the secured creditors

5. All of the information set forth in this Disclosure Statement is true and correct to the best of my knowledge

I declare under penalty of perjury under the laws of the State of California and the United States of American that the foregoing is true and correct and that this declaration was executed this 15th day of February, 2010 at San Jose, California.

RICHARD J. MERRITT